

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THILCIA E. SCHINABECK  and | § | Case No. 08-41942 |
| CHRIST NICHOLAS SCHINABECK | § | |
| | § | |
| Debtors | § | Chapter 7 |

| | | |
|---|---|---|
| THILCIA E. SCHINABECK | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 11-4022 |
| | § | |
| WELLS FARGO BANK, N.A. | § | |
| | § | |
| Defendant | § | |

**MEMORANDUM OF DECISION[1]**
**RESOLVING COMPETING MOTIONS FOR SUMMARY JUDGMENT**

ON THIS DATE the Court considered the Motion for Summary Judgment filed by

the Defendant, Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant"), and the

competing Motion for Partial Summary Judgment (Liability Only) filed by the Plaintiff,

Thilcia E. Schinabeck ("Plaintiff" or the "Debtor").  Following the submission of

responsive pleadings on the summary judgment issues, the Court conducted a hearing on

the competing motions on June 17, 2014.  The complaint in this action alleges that post-

discharge communications by Defendant to Plaintiff related to the real property located at

7045 Grand Hollow Drive, in Plano, Texas (the "Grand Hollow Property") violate the

---

[1] This Memorandum of Decision is not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as other evidentiary doctrines applicable to the specific parties in this proceeding.

discharge injunction issued for the protection of the Plaintiff-Debtor pursuant to 11 U.S.C. § 524(a)(2). Based upon the Court's consideration of the competing Motions, the responses in opposition to each motion, the proper summary judgment evidence tendered to the Court, the argument of counsel, and for the reasons stated in this Memorandum, the Court concludes that Plaintiff's Motion for Partial Summary Judgment (Liability Only) should be granted and that the Motion for Summary Judgment filed by Defendant Wells Fargo Bank, N.A. should be denied.[2]

## Factual and Procedural Background[3]

This case concerns property located in Plano, Collin County, Texas purchased by Plaintiff and her husband on or about April 13, 2006, and against which Defendant Wells Fargo held first- and second-position deed of trust liens.[4] Though Plaintiff occupied the Grand Hollow Property initially for a period of three months and made the required payments,[5] certain financial hardships arose which precluded further payments and, by the time the Plaintiff and her spouse filed their joint voluntary petition for relief under

---

[2] This Court has jurisdiction to consider the complaint pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a) as a proceeding "arising under" Title 11, United States Code, and a proceeding "arising in" a case under Title 11. The Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

[3] The facts presented are those the Court believes to be uncontested between the parties and are presented only as a general factual background to the legal claims asserted in the case. This section is not intended to resolve any disputed or contested facts.

[4] *See* Defendant's Ex. D, Michael Dolan Dec. at ¶ 2; Ex. D-1, Note; Ex. D-2, Deed of Trust.

[5] Plaintiff's Ex. 1 at ¶ 3.

Chapter 7 of the Bankruptcy Code with this Court on or about July 29, 2008, the Plaintiff

and her spouse were substantially in default on the Note.[6]  In the Chapter 7 bankruptcy

schedules, the Debtors listed Wells Fargo as an unsecured creditor, ostensibly from the

belief that Defendant had already foreclosed on the Grand Hollow Property.[7]  The

Plaintiff did not reaffirm the underlying debt related to the Grand Hollow Property.[8]

Wells Fargo was properly served with notice of the bankruptcy case and, as demonstrated

by its later participation therein, had full knowledge of the proceedings.  The Defendant

was also fully aware that Plaintiff no longer resided at the Grand Hollow Property.

Indeed, the voluntary petition which initiated the Plaintiff's bankruptcy case lists the

primary residence for Plaintiff and her husband as 9601 Log Run Ct., McKinney, TX (the

"McKinney Home"), which corresponds to the Plaintiff's listing of her real property on

Schedule A and her homestead exemption claim listed on Schedule C.[9]

    Following the filing of Plaintiff's bankruptcy case, this Court, the Hon. Brenda T.

---

[6] *See* Defendant's Ex. D-4.

[7] Plaintiff's Statement of Financial Affairs, Continuation Sheet No. 1, lists Defendant as having repossessed or foreclosed on the Property located at 7045 Grand Hollow Dr., Plano, TX 75024  in 2007. *See* Plaintiff's Ex. 6, pg. 3.  When Plaintiff visited the Grand Hollow Property in April 2008, she discovered that someone had changed the locks.  She then assumed that Wells Fargo had "foreclosed on the Property or would do so shortly." Plaintiff's Ex. 1 at p. 2.

[8] Contrary to an allegation of the First Amended Complaint, Plaintiff and her spouse never declared their intent to surrender the Grand Hollow Property on their Chapter 7 Statement of Intentions. That Statement referenced only their intent to reaffirm the mortgage debt with Countrywide Home Loans collateralized by the McKinney Home and to surrender certain property located at 1736 Valley View Dr., in Cedar Hill, TX to Washington Mutual Home Loans.  The Grand Hollow Property was not addressed, ostensibly due to Plaintiff's belief that Defendant had already foreclosed its interest in 2007 or 2008.

[9] *See* Chapter 7 Voluntary Petition, plus required statements and schedules filed on July 29, 2008 [dkt #1] in Case No. 08-41942.

Rhoades, presiding, entered an Agreed Order Granting Relief from Stay concerning the Grand Hollow Property that terminated the automatic stay pursuant to 11 U.S.C. § 362(d).[10]  Shortly thereafter, on November 5, 2008, this Court entered an Order of Discharge for the benefit of the Plaintiff and her spouse under 11 U.S.C. § 727 which discharged the Debtor and her husband from, *inter alia*, any personal liability on the indebtedness owed to Wells Fargo and secured by the Grand Hollow Property.  The Defendant was served by first class mail with a copy of this order by the Bankruptcy Noticing Center.  No debt owing by the Plaintiff to the Defendant was subsequently excepted from the scope of that discharge order.

Following the entry of the order granting discharge, Plaintiff routinely began to receive written communications from Defendant regarding the Grand Hollow Property. These included monthly statements relating to the existence of the underlying debt as well as other communications.  Each of these communications was sent directly to the Plaintiff at her McKinney Home address, not to the Plano address of the Grand Hollow Property. In response to these communications, the Plaintiff's counsel demanded in April 2009 that the Defendant cease such activities, characterized as "serious debtor harassment and continued attempts to collect discharge debts."[11]  Negotiations ensued thereafter that culminated in the execution of a "Settlement, Release, and Confidentiality Agreement" between the Plaintiff and the Defendant on or about July 26, 2010 concerning these

---

[10] Plaintiff's Ex. 10.

[11] Plaintiff's Ex. 13-D.

alleged discharge violations.[12]

The signing of the July 2010 Settlement Agreement, however, did nothing to deter Wells Fargo from continuing its pattern of sending periodic written communications to the Plaintiff regarding the Grand Hollow Property.  Between July 26, 2010 and February 1, 2011, Plaintiff received nine (9) written communications from Defendant relating to the property.  Due to the continuing actions of the Defendant, on February 1, 2011, Plaintiff filed this adversary proceeding seeking damages for civil contempt arising from the asserted violations of the discharge injunction.

The filing of the adversary complaint in this case did nothing to deter the stream of correspondence.  In the 12-month period between February 1, 2011 and January 19, 2012, the date of Plaintiff's First Amended Complaint, Plaintiff received 18 more documents. After January 19, 2012, Plaintiff received at least 33 more written communications, the last made known to the Court was dated May 16, 2014, for a grand total of sixty.[13]

---

[12]  Plaintiff's Motion for Summary Judgment references a letter dated April 29, 2009 as a "cease and desist letter reminding Defendant about Plaintiff's bankruptcy" and seeking an end to the written communications. Plaintiff's Motion at 7, ¶ 16.  Plaintiff's Ex. 3 contains an admission from Defendant that it received a letter so dated, *see* Plaintiff's Ex. 3 at p. 14, yet the letter itself was not actually submitted.  The same is true for a July 2, 2010 letter also referenced in Plaintiff's Ex. 3.  Plaintiff also provided emails dated May 11, 2010, June 3, 2010, and October 29, 2010 between its counsel and that of Wells Fargo as Ex. 13-D.

[13] Plaintiff attached the first 46 written communications to its Motion for Summary Judgment (Liability Only) as part of Exhibit 1, yet referred to them subsequently by their own exhibit numbers.  For the sake of clarity, the Court will refer to each as Plaintiff's Exhibit 1-#, the first being, for example, Plaintiff's Ex. 1-1.  The final 14 communications were attached as exhibits to two separate motions to supplement the summary judgment record.  These communications shall be referred to as Plaintiff's Ex. Supp. #, the first being Plaintiff's Ex. Supp. 1.  Because the existence and substance of these communications is not in genuine dispute, the Court will refer to Plaintiff's exhibits to avoid needless duplication.

Except for brief periods between October 2012 to March 2013 and April to October 2013, Plaintiff continued to receive regular communications from Wells Fargo, often more than once a month.  These communications can be characterized into seven general categories:

(1)  <u>Monthly Statements</u>: a summary of the current account status, including the current monthly payment plus unpaid late charges and other fees.[14]  Clothed in the veneer of a purely informational document – the words "For Informational Purposes" are emblazoned across the header – these statements are "provided as a courtesy should you voluntarily decide to make your loan payments," and according to the disclaimer language included, "should not be construed as an attempt to collect a debt for payment contrary to any protections you may have received pursuant to your bankruptcy case."[15]

(2)  <u>Interest Rate Changes</u>: notices of intent from Wells Fargo to change the interest rate on the adjustable rate mortgage.[16]

(3)  <u>Hazard Insurance Notices</u>: notices related to the expiration of existing hazard insurance coverage and the homeowner's options for obtaining substitute coverage.[17]

(4)  <u>Homeowner's Insurance Notices</u>: letters offering homeowner's insurance through Wells Fargo Insurance, Inc.[18]

---

[14] As of May 16, 2014, Plaintiff received 33 such statements, all of which are identical to Plaintiff's Ex. 1-1 save the ongoing accrual of unpaid payments, fees, and interest.

[15] *Id.*

[16] Plaintiff received 8 such notices typified by Plaintiff's Ex. 1-5.

[17] Plaintiff received 10 such notices, typified by Plaintiff's Ex. 1-10.

[18] Plaintiff received 6 such letters, typified by Plaintiff's Ex. 1-11.

(5)    <u>Online Banking Notice</u>: a notice regarding changes to Wells Fargo's "Online Access Agreement" governing the use of Wells Fargo Online or Wells Fargo Business Online.[19]

(6)    <u>Escrow Disclosure Notice</u>: a notice regarding shortages in the escrow account, including payment information, dates, and required balances.[20]

(7)    <u>Periodic Statement Notice</u>: a notice regarding the resumption of periodic statements in November 2013.[21]

Following a protracted discovery process, the parties filed these competing Motions for Summary Judgment. The Plaintiff seeks summary judgment as to liability only on the grounds that the communications constituted willful and intentional violations of the discharge injunction arising under 11 U.S.C. § 524(a). The Defendant contends that summary judgment in its favor is appropriate because its remaining *in rem* rights in the Grand Hollow Property permit it to provide certain types of communications to the Plaintiff as the property owner, without constituting a violation of the discharge injunction. At some time beyond the submission of the summary judgment papers by the parties, the above-enumerated adversary proceeding was reassigned to the undersigned judge. The parties have since tendered oral argument to this Court. At the conclusion of that hearing, the Court took the matter under advisement.

---

[19] Plaintiff received one such notice, Plaintiff's Ex. 1-7.

[20] Plaintiff received one such notice, Plaintiff's Ex. 1-6.

[21] Plaintiff received one such notice, Plaintiff's Ex. Supp-3.

## Discussion

*Plaintiff's Motion to Strike Interrogatories and for Sanctions*

Before addressing the merits of the parties' summary judgment motions, the Court must address the Plaintiff's "Motion to Strike Untimely Interrogatory Answer and Defenses and Motion for Sanctions" which seeks to strike as untimely the Defendant's Amended Answer to Plaintiff's First Set of Interrogatories No. 6 and, in so doing, seeks to prohibit Defendant's arguments, addressed *infra*, that federal and state regulations require the sending of specified communications at issue in this case.[22]

Having reviewed the submissions of both parties, the audio record of that hearing, and the relevant legal authorities, the Court concludes that Plaintiff's Motion to Strike should be denied. The Defendant initially answered a particular interrogatory in the negative when asked if it was making the legal contention that it had the right to continue to send statements to Plaintiff following her discharge.[23] Upon discovering through its review of the Plaintiff's Motion for Summary Judgment that its answer had been misconstrued by the Plaintiff due to the ambiguity of the word "statements," Defendant fulfilled its duty under FED. R. CIV. P. 26(e) to supplement and correct that interrogatory. This correction occurred after a lengthy discovery process wherein Defendant and its representatives had communicated to the Plaintiff that it felt compelled by certain legal

---

[22] This motion to strike was actually argued before Judge Rhoades before the reassignment of the case and this judge has consulted the audio record of that argument in its determination of the motion.

[23] Plaintiff's Ex. 17 – *Defendant's Answers to Plaintiff's First Request for Interrogatories* at No. 6 on p. 4.

regulations to send certain of the correspondence,[24] while the filing of Defendant's

Motion for Summary Judgment presented in greater detail its position that it possessed the

legal right or duty to send certain written communications to the Plaintiff.  Whether

Defendant actually possessed the legal right or responsibility to continue sending written

documentation to the Plaintiff will be decided through the summary judgment process.

According to the Fifth Circuit, "[t]he rules of discovery are designed to narrow and

clarify the issues and give the parties mutual knowledge of all relevant facts, thereby

preventing surprise." *Dilmore v. Stubbs*, 636 F.2d 966, 969 (5th Cir. 1981).  Rule 26(e)

helps achieve this by requiring that a party who has responded to an interrogatory, request

for production, or request for admission "supplement or correct its disclosure or response

. . . if the party learns that in some material respect the disclosure or response is

incomplete or incorrect." FED. R. CIV. P. 26(e).  The basic purpose of the supplementation

rule is to prevent prejudice or surprise.  *Reed v. Iowa Marine & Repair Corp.*, 16 F.3d 82,

85 (5th Cir. 1994); *accord, Dilmore*, 636 F.2d at 969 [citing the purpose of the rule is to

prevent "trial by ambush" — the introduction of an entirely new issue of which the

opposing party is previously unaware].  There is no such surprise or prejudice here.  This

is not an abuse of the discovery process.  Indeed, it could be persuasively argued that no

supplementation was needed here at all under Rule 26 (e)(1)(A) due to information

tendered by the Defendant during the discovery process.  However denominated,

---

[24] *See, e.g.,* Ex. B to Defendant's response to Plaintiff's Motion to Strike, Wells Fargo's *Supplemental Answers and Objections to Plaintiff's Second Request for Interrogatories*.

interrogatory answers are not binding judicial admissions and the presentation of the

Defendant's correction of its interrogatory answer does not create exceptional

circumstances whereby the Defendant should be bound by its initial answer due to

prejudice imposed upon the Plaintiff. *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 527 (5th

Cir. 2010). Thus, the Plaintiff's "Motion to Strike Untimely Interrogatory Answer and

Defenses and Motion for Sanctions" will be denied by separate order.

*Summary Judgment Standards*

The parties brought the competing motions for summary judgment in this

adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7056. That rule

incorporates Federal Rule of Civil Procedure 56, which provides that summary judgment

shall be rendered "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[25]

Any party seeking summary judgment always bears the initial responsibility of

informing the court of the basis for its motion. *Celotex Corp. v. Catrett,* 477 U.S. 317,

323 (1986). As a movant, a party asserting that a fact cannot be genuinely disputed must

support that assertion by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or
> declarations, stipulations (including those made for purposes of the motion
> only), admissions, interrogatory answers, or other materials; or

---

[25] Pursuant to the scheduling order issued in this adversary proceeding, motions for summary judgment are required to comply in format and content with Local District Court Rule CV-56 and such motions are decided under the procedures stated therein.

> (B) showing that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).

The manner in which the necessary summary judgment showing can be made depends upon which party will bear the burden of persuasion at trial. The Plaintiff bears the ultimate burden of proof in this proceeding. Thus, as to her motion for partial summary judgment as to liability, the Plaintiff "must support [her] motion with credible evidence–using any of the materials specified in Rule 56(c)–that would entitle [her] to a directed verdict if not controverted at trial." *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting); *Int'l Shortstop, Inc. v. Rally's, Inc*., 939 F.2d 1257, 1264–65 (5th Cir.1991).

Conversely, in light of the burden of persuasion resting on the Plaintiff, the Defendant with regard to its motion for summary judgment "may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex*, 477 U.S. at 322-23 (internal citations omitted); *Stults v. Conoco, Inc*., 76 F.3d 651, 655 (5th Cir. 1996).

If either motion is supported by a *prima facie* showing that the moving party is entitled to judgment as a matter of law, a party opposing that motion may not rest upon the mere allegations or denials in its pleadings, but rather must demonstrate in specific

responsive pleadings the existence of specific facts constituting a genuine issue of

material fact for which a trial is necessary. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 256-57 (1986); *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010).  "A fact

is material only if its resolution would affect the outcome of the action . . . ."  *Wiley v.

State Farm Fire & Cas. Co.,* 585 F.3d 206, 210 (5th Cir. 2009); *accord Poole v. City of

Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).  Accordingly, a genuine issue of material

fact is presented and a trial is required only if the non-movant with the ultimate burden of

proof is able to produce summary judgment evidence sufficient to sustain a finding in its

favor on that issue.  *Anderson,* 477 U.S. at 257 [requiring "evidence from which a jury

might return a verdict in [its] favor"]; *see also Apache Corp. v. W & T Offshore, Inc.,* 626

F.3d 789, 793 (5th Cir. 2010); *Terry v. BP Amoco Chem. Co., 2014 WL 2916*414 at *2

(5th Cir. June 27, 2014).

     The summary judgment record is viewed in the light most favorable to the non-

moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587

(1986).  The Court will not weigh the evidence nor evaluate its credibility; however, if the

evidence demonstrating the need for trial "is merely colorable or is not significantly

probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.  Thus, a

non-movant must show more than a "[m]ere disagreement" between the parties, *Calpetco

1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1413 (5th Cir. 1993), or that there is

merely "some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.

Essentially, if a non-movant fails to present specific facts that present a triable issue, its

claims should not survive summary judgment. *Giles v. Gen. Elec. Co.,* 245 F.3d 474, 494 (5th Cir. 2001).

*Discharge Injunction*

A bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act to collect, recover or offset . . . as a personal liability of the debtor" any debt discharged under section 727.  11 U.S.C. § 524(a)(2).  The purpose of this provision is reflected in the legislative history of the statute as follows:

> The injunction is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts.  This paragraph has been expanded . . . to cover any act to collect, such as dunning by telephone or letter, or indirectly through . . . harassment, threats of repossession and the like.  The change is . . . intended to ensure that once a debt is discharged, the debtor will not be pressured in any way to repay it.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 363-64 (1978); S. Rep. No. 959, 95th Cong., 2d Sess. 80 (1978).

The United States Supreme Court has described the protection which a debtor derives from the entry of a discharge order as one of the "[c]ritical features of every bankruptcy proceeding. . . ."  *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 363-64 (2006).  The discharge accomplishes a fundamental objective of a consumer bankruptcy case — a "fresh start" that safeguards an individual debtor against pressure and

harassment by a creditor seeking satisfaction of a pre-existing debt.  Thus, "when a discharge injunction is violated, a debtor is denied one of the primary benefits offered by the present bankruptcy system." *Mooney v. Green Tree Servicing, L.L.C.,* 340 B.R. 351, 358 (Bankr. E.D. Tex. 2006).

This Court is authorized to enforce the protections granted to a debtor under §524 by civil contempt[26] through the provisions of §105(a) of the Bankruptcy Code.[27]  *Placid Refining Co. v. Terrebonne Fuel and Lube (In re Terrebonne Fuel and Lube, Inc.)*, 108 F.3d 609, 613 (5th Cir.1997); *In re Ritchey*, 512 B.R. 847, 860 (Bankr. S.D. Tex. 2014). In order to prove an actionable violation of the discharge injunction under 11 U.S.C. § 524(a), a plaintiff must establish by clear and convincing evidence that a defendant: (1) took an action to collect a debt as a personal liability of the debtor; (2) such defendant had knowledge of the discharge; and (3) such defendant continued the activity despite the discharge.  *In re Eastman*, 419 B.R 711, 724-25 (W.D. Tex. 2009).  A defendant's

---

[26] Generically, "a movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Whitcraft v. Brown*, 570 F.3d 268, 271-72 (5th Cir. 2009) (citing *Martin v. Trinity Indus., Inc.,* 959 F.2d 45, 47 (5th Cir.1992)).  In the context of a violation of the discharge order,

> Even though section 524(a)(2) is a statutory provision, as it grants relief triggered by the discharge order, the injunction has been equated to an order of the court. The discharge injunction is broad and prohibits any act taken to collect a discharged debt as a personal liability of the debtor. Thus, the discharge injunction is a definite and specific court order that requires creditors to refrain from particular acts, i.e., any act to collect, recover, or offset any discharged debt as a personal liability of the debtor.

*In re McClure*, 420 B.R. 655, 659 (Bankr. N.D. Tex. 2009).

[27]  11 U.S.C. §105(a) states that "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. . . ."

subjective intent is relevant only to the actions which violate the injunction.  The fact

"[t]hat the actions are intentional– as opposed to the actual violation of the injunction

being intentional– is sufficient." *In re McClure*, 420 B.R. 655, 663 (Bankr. N.D. Tex.

2009); *In re Sanburg Fin. Corp.*, 446 B.R. 793, 803 (S.D. Tex. 2011).  Sanctions

available "may include actual damages, attorneys' fees and, when appropriate, punitive

damages." *Mooney*, 340 B.R. at 360 (internal citations omitted).

   It is undisputed that the Plaintiff's personal liability on the debt to the Defendant

was discharged upon the entry of the discharge order on November 5, 2008.[28]  That order

contained specific language prohibiting any attempts to collect a discharged debt.[29]  The

Defendant acknowledges that it had actual knowledge of that discharge order.[30]  Thus, the

latter two requirements to establish the existence of a discharge violation are clearly

---

[28]  Plaintiff's Ex. 8 — *Defendant's Responses to Plaintiff's Request for Admissions* at Nos. 9 and 10 on p. 5.

[29]   The explanation accompanying the discharge order provided the following information to all creditors:

>    The discharge prohibits any attempt to collect from the debtor a debt that has been discharged.  For example, a creditor is not permitted to contact a debtor by mail, phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or to take any other action to collect a discharged debt from the debtor. . . .  A creditor who violates this order can be required to pay damages and attorney's fees to the debtor.

>    However, a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case.

See *Discharge of Debtor* entered in case # 08-41942 on November 7, 2014 [dkt #17]; Plaintiff's Ex. 10.

[30]   It is uncontested that the Defendant was notified of the commencement of the bankruptcy case, was listed as a creditor in the matrix and on the schedules, sought and received relief from the automatic stay to allow its foreclosure action against the Grand Hollow Property and was notified of the entry of the discharge order.

**-15-**

satisfied.  The legal question remaining before the Court is whether the transmittal of

more than sixty (60) written communications by the Defendant to the Plaintiff regarding

the Grand Hollow Property in the post-discharge period constitutes an action by the

Defendant to collect a debt as a personal liability of the debtor.[31]  The Plaintiff contends

that these repetitive communications constitute "unrelenting attempts to collect a

discharged mortgage debt and constant harassment."[32]

    Throughout the course of this protracted litigation, the Defendant has offered

different justifications for its post-discharge conduct.  Clerical oversight,[33] the existence

of banking and financial regulations and, finally, the exercise of its *in rem* rights have all

been offered as justification for the transmittal of these documents.

    The Court rejects the Defendant's contention that its activities in the post-

discharge period were mandated by banking and financial regulations.  Only two of the

cited statutes have any application at all.  The first requires the submission of an itemized

notice regarding the establishment of an escrow account for any federally-regulated

---

[31]  The occurrence of these communications and their content are not in dispute. With one duplication (Defendant's exhibits A-9 and A-27 are identical), the parties initially submitted the same exhibits.  In fact, Defendant's Motion for Summary Judgment actually contained the same exhibits attached to Plaintiff's Original Complaint.  Plaintiff has subsequently supplemented the summary judgment record with additional communications received during the pendency of the case, bringing the total to 60, but no material factual dispute exists regarding the communications themselves.

[32]  Plaintiff's Motion at 1.

[33]  See general explanation of Defendant's coding system and responsibility for it at Plaintiff's Ex. 16 at 130:15 - 82:11.  Notwithstanding the repeated contacts and the subsequent settlement agreement regarding the contacts, the mail code regarding the Plaintiff was apparently never changed.  Plaintiff's Ex. 16 at 138:12 - 138:21.  Of course, Wells Fargo is responsible for any consequences arising from such errors.

mortgage. 12 U.S.C. § 2609.   The second requires the transmission of notices of an "adjustment to the interest rate" in a variable-rate transaction. 12 U.S.C. § 226.20(c). However, Defendant sent only one[34] and eight[35] of these statements, respectively.   For the vast majority of communications presented, no statutory or regulatory requirement compelled the continued transmittal of these documents to the Plaintiff in the face of her Chapter 7 discharge.  To the contrary, section 51.002 of the Texas Property Code applies only to property used as the residence of the debtor and the Plaintiff had abandoned her occupancy of the Grand Hollow Property months prior to her bankruptcy filing. Likewise, 12 U.S.C. § 2605 contains no applicable disclosure requirements to the debtor in this case.[36]  Neither can the requirements of Regulation X, created to implement the Real Estate Settlement Procedures Act ("RESPA"), or Regulation Z, requiring the submission of periodic mortgage statements to consumers under the auspices of the Truth in Lending Act, be reasonably interpreted to mandate the violation of a specific federal injunction.[37]   The Defendant can simply find no safe harbor in these provisions by which it can justify its post-discharge conduct.

---

[34] Plaintiff's Ex. 1-2.

[35] Plaintiff's Ex. 1-5, 1-14, 1-23, 1-32, 1-41, 1-45, Supp-2, Supp-10.

[36] The disclosure requirements of Section 2605 only come into play "at the time of application for the loan, whether the servicing of the loan may be assigned, sold, or transferred to any other person at any time while the loan is outstanding" and "any assignment, sale, or transfer of the servicing of the loan to any other person." 12 U.S.C. § 2605 (a), (b)(1).  Subsection (g) relating to escrow accounts requires no disclosure, only proper administration. *Id*. at (g).

[37] Though perhaps unnecessary, each of these regulations has now been supplemented to set forth specifically that which should have been realistically known generally.  See 12 CFR § 1024.39 (c), (d) and 12 CFR §1026.41 (e)(5), each effective as of January 10, 2014.

Ultimately, Wells Fargo relies upon its belief that the existence of its *in rem* rights against the Grand Hollow Property provides an absolute defense for every communication that it desired to transmit to the Plaintiff after the entry of her discharge order.  At first glance, this position appears compelling.  As previously recognized by this Court, the "juxtaposition of the continued existence of a lien, but with no corresponding personal liability for a debtor, creates an awkward situation wherein a creditor may legitimately possess a reason to communicate with a debtor in the post-discharge period." *Mooney*, 340 B.R. at 358 (citing *In re Garske*, 287 B.R. 537 (B.A.P. 9th Cir. 2002)).[38] Courts have certainly recognized the propriety of certain post-discharge communications as might be necessary under applicable state law to allow a lienholder to enforce its *in rem* rights and, generally speaking, "merely maintaining . . . a lien against a property, without additional coercive attempts to collect the debt as a personal liability, does not violate the discharge injunction."  *Brown v. Bank of America (In re Brown)*, 481 B.R. 351, 361-62 (Bankr. W.D. Pa. 2012) (quoting *Casarotto v. Mo. Dep't of Revenue (In re Casarotto),* 407 B.R. 369, 378 (Bankr. W.D. Mo. 2009)).  However, it cannot be reasonably questioned that the chronological period necessary for the Defendant to exercise its *in rem* rights has been unreasonably extended in this case due to the Defendant's unilateral refusal to foreclose its interest in the property.  The Defendant's

---

[38] Courts across the country have recognized that in this circumstance, "[s]ome contacts are necessary and proper for maintaining the debtor-creditor relationship with regard to the surviving lien." *In re Bandy*, 2003 WL 21781995, at *2 (Bankr. N.D. Iowa, July 29, 2003) (citing *Garske*, 287 B.R. at 545); *see In re Henry*, 266 B.R. 457, 472 (Bankr. C.D. Cal. 2001) [stating communication from a creditor might be appropriate to "facilitate the making of monthly post petition payments by the debtor"]; *see also In re Mele*, 486 B.R. 546, 556 (Bankr. N.D. Ga. 2013).

maladroit handling of this property over a period of years has thus preserved unnecessarily the Plaintiff's interest in the property and the debtor-creditor relationship between the parties, notwithstanding the Plaintiff's clearly-expressed desire in 2008 to terminate that relationship.[39]  Thus, the platform upon which a possible violation of the discharge injunction could occur was solely a product of the Defendant's inertia.

However, it is not the failure of the Defendant to foreclose, and the seemingly perpetual existence of the lien caused thereby, that is at issue here.  It is the affirmative activities of the Defendant committed directly against a discharged debtor while it elects to forego its foreclosure rights that subjects it to liability.  Month after month, for a period of almost three years, as the Defendant unilaterally extended the existence of its *in rem* rights, it sent the Plaintiff notices of ever-escalating amounts, including assessments for late fees, tax accruals, and insurance reimbursements, admittedly accompanied by a disclaimer that it was sent "for informational purposes only," but also always accompanied by detachable payment coupons,[40] undoubtedly intended "as a courtesy should you voluntarily decide to make your loan payment."

---

[39]  The undisputed facts demonstrate that the Plaintiff-Debtor consistently and emphatically disavowed any interest in retaining the property post-discharge or in receiving any communications from the Defendant whatsoever.  In fact, her bankruptcy schedules indicate her erroneous belief that the Defendant had already foreclosed on the Grand Hollow Property at the time of the bankruptcy filing.  Accordingly, her Notice of Intent in her schedules did not even list the Property.  Once her erroneous belief was corrected, she endorsed the termination of the automatic stay for the benefit of Wells Fargo.  When the communications began post-discharge, she objected strenuously through counsel, sending no fewer than three separate "cease and desist" letters before eventually signing the settlement of July 2010.  Once they began anew in August of that year, she again objected repeatedly, eventually bringing this adversary proceeding in a final attempt to make the letters, which now number at least sixty, stop.  Other than two short respites, they did not.

[40]  Plaintiff's Ex. 16 at 121:4 - 121:14.

**-19-**

The Defendant claims that each type of written communication sent to Plaintiff in this case has been validated by at least one bankruptcy court.[41]  Taken in isolation, each communication might be deemed relatively harmless.  Further, one might rightfully observe that the monthly intrusions by letter differ significantly from more direct forms of communication, such as repeated phone calls.  However, it is appropriate in the §524 context not only to look at each individual act, but also to examine the totality of the circumstances surrounding the Defendant's conduct.   *Bibolotti v. American Home Mortg. Servicing, Inc.*, 2013 WL 2147949, at *9 (E.D. Tex., May 15, 2013).  Though arguably harmless in isolation, these acts taken collectively exhibit a refusal by the Defendant to accept the finality of the discharge order and the termination of its debtor-creditor relationship with the Plaintiff.  Such constant, repetitive actions of asserting the ongoing legal existence of a financial obligation and inviting the consumer to "voluntarily decide to make your loan payments," even if viewed as innocuous in isolation, can collectively erode the protections intended to be conveyed to a discharged debtor by the discharge injunction, particularly when initiated and maintained over a course of years by a sophisticated business entity seeking to influence the actions of a consumer debtor in a debtor-creditor environment maintained and extended solely by its own hand.  The cumulative effect of those repetitive (and unnecessary) actions is not dissolved by the

---

[41] Plaintiff's Ex. 1-2.  Interestingly, though Defendant argues that "sending coupons or regular monthly statements" is permissible, Defendant's representative testified that such statements constitute "collection notice[s]" and would not be sent to any person whose debt had been discharged in bankruptcy. *See* Defendant's Motion at 10 (internal citations omitted); Plaintiff's Ex. 16 at 81:21 - 82:11.  In all, the Defendant sent 33 such statements to Plaintiff.

inclusion of a disclaimer. *In re Bruce,* 2000 WL 33673773, at *3 (Bankr. M.D.N.C., Nov. 7, 2000) [repeated transmission of mortgage loan statements with payment coupons constitute violations of the discharge injunction despite disclaimer that statement was "not a demand for payment"]; *see also Bibolotti* at *12 [finding that, notwithstanding disclaimer language, "[i]t is disingenuous for Defendants to argue that the letters do not contain a demand for payment when the ARM notices contain everything a billing statement or invoice would contain."].[42]

Again, the environment which created the opportunity for these aggregate discharge violations to occur was solely cultivated by Wells Fargo. One might argue that it has a right to maintain its lienholder status in perpetuity. However, when it elects to do so, thereby maintaining its relationship with a discharged debtor over a period of years, it must take affirmative steps to control its own internal processes and any ongoing automated communications with that discharged debtor. See *Butz v People First Fed. Credit Union (In re Butz)*, 444 B.R. 301, 305 (Bankr. M.D. Pa. 2011) and cases cited therein ["When considering the willfulness of acts which violate the stay, courts have rejected the so called 'computer did it' defense."]; *Jones v. Wells Fargo Home Mortgage, Inc.*, 489 B.R. 645, 657 (E.D. La. 2013) ["Sophisticated commercial enterprises have a clear obligation to adjust their programming and procedures and their instruction to employees to handle complex matters correctly."], citing *McCormack v. Fed. Home Loan*

---

[42] Like the communications found impermissible in *Bibolotti*, the monthly statements in this case contained specific payment and balance information, due dates, and detachable payment coupons to be used for addressing "overdue payments" which in August 2010 already amounted to several hundred thousand dollars.

*Mortg. Corp. (In re McCormack)*, 203 B.R. 521, 525 (Bankr. D.N.H. 1996).  It admittedly failed to do so in this case.

As a result, the communications knowingly and repeatedly issued by Wells Fargo to the Plaintiff collectively constitute an impermissible action to collect this debt as a personal liability of this particular debtor in violation of the discharge injunction issued by this Court pursuant to 11 U.S.C. § 524(a)(2).[43]   Accordingly, the Motion for Partial Summary Judgment (Liability Only) filed by the Plaintiff, Thilcia E. Schinabeck, is granted and the competing Motion for Summary Judgment filed by the Defendant, Wells Fargo Bank, N.A., is denied.  The Court will set the procedure for a damages hearing by separate order.

Signed on 10/20/2014

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE

---

[43]  The Defendant clearly retains the right to send to the Plaintiff all communications required under state law to accomplish the enforcement of its deed of trust lien.

**-22-**